Good morning, Your Honor. I'm Lynette Moore. I represent Demian Johnson on appeal for the denial of the district court of his petition for habeas corpus. This appeal is quite properly restricted to one crucial issue, which is the Batson motion that he made in the trial court and the implications that flow from that. His Batson motion was based on gender. That was the compensable group. It was a case of domestic violence where the victim was the woman. And the prosecutor, when there were three men on the panel, elected to exercise periphery challenges against two of them. Counsel then made a, what in California is called a Wheeler motion, and stated two grounds for it or two bases for his crime of facial case, which were the number, the statistical disparity, and the fact, the nature of the crime, the nature of the case, which would provide a motive for the prosecutor to strike it. Which is the more intuitive when a man is charged with a domestic violence crime, to leave women on the jury or to take them off the jury? To leave women on the jury or to take them off the jury. It would be logical for the defense to remove the women from the jury and the prosecutor to remove the men. I think that this is an intuition, whether it's accurate or not, that's shared by quite a lot of trial lawyers. Justice O'Connor makes that very point in her opinion, her concurring opinion in JEB, where she says that they should restrict the scope, that the Supreme Court should restrict the scope of Batson's application to gender cases, because it only seems fair to allow a woman who's been subject to domestic abuse to attempt to avail herself of an all-woman panel. So clearly, she felt that an all-woman panel wouldn't in some way benefit women, which I'm not arguing that it's accurate. I merely argue that it's pervasive disbelief. Counsel, do we know from this record how many men there were in the jury pool? No. The Court says there were more men, but they don't say exactly how many. Is that a problem for us in terms of determining whether or not the state court's decision was contrary to Federal law if we don't know what the jury pool was comprised of? Well, this is roughly the same – well, first of all, this is roughly the same sort of facts that were presented in Turner v. Marshall, and there they didn't have a record of the composition of the veneer. Secondly, this is a gender case, so we can approximate the composition of the veneer. But can we do that in light of the standard of review on habeas? Well, that depends. If the California courts were applying the wrong legal standard in determining whether the prima facie case had been established, then it's a de novo review, and, yes, of course we can. We can what? Then, of course, we can make such an approximation. We can inquire, you know. It's this – then it becomes the same case as Turner v. Marshall. Then do we have enough here to know – the first alternate was apparently a man. It's probably – there were a couple of men on the jury. The total number of strikes that were made was how many? We don't have anything to deal with. In other words, I'm thinking – I know it was a certificate of appealability case, but you get something like Supreme Court's decision in Miller et al. when they talk a lot about strikes and percentages, and they say one of the things you look at even for a prima facie case is not just the statistics, although they are important, but things like how the questioning went and what was the manner of dealing with the in-group and the out-group and voir dire and stuff. We don't have any of that. We don't even know who was who here, do we? Which puts us in roughly the same position as Turner v. Marshall, where there were five strikes out of nine, if I remember right, against African-Americans. There was no – there was no statistical evidence on the composition of the veneer. And basically the statistical evidence by itself was held to be – was held to suffice. They say there's no magic number of challenged jurors, which shifts the burden. And then they collect cases that hold that a Batson violation may be found even if members of the cognizable group remain on the panel. So a comparative – what Turner says is a comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility. Actually, I would argue that we have a stronger case than Turner because we can point to a motivation or a reason in addition to the statistical disparity. The – do we know for sure who was remaining? We were able to narrow it down to three jurors. And it was clear from the responses of those three, two of the three had to be men. Those had to be the two men. All of those jurors gave very – first of all, none of them were interrogated by the prosecution. All of them gave very, very neutral responses to the standard questions. They were employed. They had no prior jury experience. They didn't have any prejudices or biases that would prevent them from being fair, that sort of thing. Also, in Turner, a crucial distinction was that every single African-American man in the jury pool was challenged or excused. We don't have that here. No, we don't. But Turner also does say that the fact that you left one on the panel is not fatal to a Batson challenge. Well, if you have the right kind of a record, of course, you can succeed on a Batson challenge because of the striking of one juror, no matter how many there are in a panel. Yes, exactly. Exactly. But that's certain information that we may not have. In the trial court, I would not have been uncomfortable making this sort of a motion at the time that the first juror was struck if I felt that it was, you know, that there were surrounding circumstances that would indicate that this was done in order to exclude the participation of men in this case. But generally, those surrounding circumstances are in the record. That's the difficulty we had. We have a very sparse record, I agree. But we do have a record that shows the crucial fact, which is this is a domestic violence case where there is a male perpetrator, allegedly, and a female victim. You would have a stronger case if all men had been stricken from the panel. But in light of the sparse record and the fact that there were men remaining on the jury, that makes your case pretty difficult, doesn't it? Difficult but not impossible. If I considered the statistical disparity alone, if this were a case, say, of a robbery or something like that, if I considered the statistical disparity alone, it would be — What is the statistical disparity to which you refer? Okay. Of the three men on the jury, two-thirds of them were stricken. On the panel at the time the motion was made, two-thirds of them were stricken. But that's kind of — I mean, statistics are only as good as the data you're looking at, and we don't know how many men there were and women in the beginning of the pool, do we? Yes. Those three were it up to that point. We had 14 members. The remaining members other than those three were women. It was a skewed sample. So you're saying that in the entire jury pool there were 14 people? I'm saying in — of the people who had been called at the point the motion was made. Only 14 people had been called. Yes. And those three were it as far as men went. But we don't know how many men were out behind the bar waiting. No, I don't. We don't know that. Well, I guess the next alternate was a man. Didn't the judge say the next alternate was a man? Yes. Yeah. Okay. But as a matter of trial practice, that becomes a bit of a lottery, too. I suppose. It could change. Yeah. All right. Thank you, counsel. Good morning, Your Honors. Deputy Attorney General Russell Lehman appearing on behalf of Respondent. May it please the Court. The first issue that this Court needs to confront is the standard of review that is to be employed here. Respondent maintains that it is the deference owed to it under the AEDPA. Each of the cases this Court has applied Wade to, it has been careful to stress either in the text or in a footnote that it comes within the window between Wade and I guess maybe Fernandez was one of the more recent ones. Here we know that both the trial and the appellate court opinion took place after the Supreme Court clarified in box that in fact in California the so-called strong likelihood language and the reasonable inference language of Babson are the same thing and in any event from that point forward are to be applied as the same thing. If the lower courts, if a lower court after box said, look, all we need to show a strong likelihood is a reasonable inference, I wouldn't have any trouble with your argument at all. But if even after box the lower court says, well, we need a strong likelihood, strong, I mean, I suppose words mean whatever you intend them to mean, but strong likelihood really does sound different from reason to infer. Well, this I was probably going to develop this more in the next argument than this, but just very briefly, just very briefly. A likelihood is simply a chance or a probability or something happening. That's the accepted and very clear. Exactly, Your Honor. But this is going to be a little syllogism here. A likelihood is simply a chance. You can have a 20 percent chance something will happen. You can have a 10 percent chance something will happen. We also know from Babson as well as reaffirmed in Perquette v. Elam that the burden is on the movement to make that prima facie case. And we also know from Babson, especially as explained in People v. Johnson, by its likening to the or analogizing rather to the Title VII cases that it was plainly referring to a preponderance of the evidence standard that the movement must meet. Well, that means that you must show it more likely than not, and at that point you're talking about a strong likelihood. So really there isn't a lot of difference in the language to the extent there is. Again, the question has been clarified for the California courts. Nobody missed boxed when it explained that. Counsel, at the time this ruling was made, what was the state of the law in terms of the California application of the standard required? Both the trial and the motion was made post box after it had been clarified. And so what do you do with Wade, which seems to say that it had not been sufficiently clarified? Well, I suppose at some point this court is hopefully going to come to the conclusion that the state court means what it says and that it's now capable of following the very clear direction given to it, if not by Wade, then by Box or by Johnson. Okay. We're bound by Wade. And so how do you suggest that we incorporate our binding precedent in Wade in resolving this case? I do not. It's the Respondent's position that you are not bound by Wade in this case, that this case comes outside of the way it is no longer applicable after the clarification by the state courts that we've now been following Batson ever since then is our position. I understand that language in Cooper would which may create a problem, doesn't it? Saying that. Let's see if I can get the language. The I think if I may, Your Honor, I think it's a similar effect that we apply Wade when the strong likelihood language is used or something to that effect. Well, again, it remains Respondent's position that Cooperwood itself, as well as Fernandez and all of them, again, you can't divorce them from their facts, and they all preceded the clarification by the state court. If we disagree with your argument, and we think that Wade and Cooperwood compel us to say that the California court used the wrong standard of review, then why should we nevertheless deny the habeas petition? Well, in that case, you would then apply the DeNovo review. And as explained in reason, as I'll touch on a couple more points here, the reason for that is because under any review, even DeNovo here, there was just a woefully inadequate showing of a prima facie case. In fact, because of that, to the extent it finds it thorny or if it wants, you know, it need not even address that question because it's plainly subject to affirmance even under DeNovo review. One of the things I wanted to touch on is something that counsel did, and that is, you know, with all due respect, and Justice O'Connor's concurrence in JD notwithstanding, this whole notion that women somehow necessarily or almost necessarily will favor a woman in a domestic violence case simply by virtue of her gender is itself stereotypically sexist and then hurled at the prosecution in support of this motion. Can intuition be ever used as part of the prima facie case? I suppose it probably can and that it has been. But particularly in this case, there's an indication that as to one of the three women versus two men thrown in this case or excused in this case, that one of them had disclosed that, in fact, her boyfriend had been accused of domestic violence by his ex-wife. And we can see in that situation where, in fact, we would probably not want that person sitting on the jury as the prosecution because they might, in fact, identify more with the man than the woman. So it really, and again, and also in these types of cases, you can also point to an equally popular stereotype, which is that women are more harsh in judging other women than they are against men. And I don't think that that has any more basis than any necessary assumption that a woman is going to favor a woman in a domestic violence case. But what it goes to show is that you can always come up with some sort of self-stereotypical justification on the basis of the type of the case in order to support such a motion. And therefore, that doesn't have that much weight. Could you make a prima facie case purely on statistics? I mean, your argument goes to discounting the statement, well, it's a domestic violence case. But just on statistics. Indeed, once we have that out of the way, the showing becomes particularly inadequate. But my question was, can you make a case on statistics alone? I think that you might be able to. I think maybe there's a suggestion, a prima facie case. I think maybe there's a suggestion in Turner that if the numbers are that starkly, you know, throw all 10, all 10 of a given race when there's only 10 in the entire veneer. I think, you know, you may not have to say much more than that in that particular case to establish prima facie. So I think, I think theoretically that. What do we have statistically here? Here, what we have is other than that the prosecutor, again, exercised two out of five of the challenges against men. Petitioner, as this Court has kind of noted, utterly, utterly failed to establish any other pertinent numbers to his claim. He did note that at that point the panel was 11-1 women. But as the trial court expressly noted, the next juror up was a man. There were a lot more men in the larger veneer. Do we know that from the record? I'm sorry? Do we know that from the record? The court so stated in denying the motion. The petitioner, in particular, the petitioner did not note how many men versus women were in the larger veneer, how large the veneer itself was, or anything else in that regard. And, in fact, to grant relief in this case on that basis would only be in derogation of this Court's precedence in Williams versus Woodford. This case is a lot more like Williams where, incidentally, this said, based on an almost identical record in this regard it is impossible to say whether any statistical disparity existed, which might, excuse me, support an inference of discrimination. That's exactly what we have here. This is not analogous to Turner. Turner, as the Court pointed out, you had five of nine excused on the basis of not juror, which generally splits the population half and half, but race, which itself is, in that case, I believe it was African-Americans, which themselves make up less than, certainly, than half of the population. So based on that inadequate record, based on Williams, this Court has to affirm in any event, because there's been no showing. And, actually, unfortunately for Petitioner, the numbers that he did establish actually proved too much, because at the time of the motion, the prosecutor had exercised five for entries, two against men, three against women. If we think of a half-and-half type of makeup of the population, if anything, the strikes are disproportionate not against men, but against women. And this also establishes that the prosecutor wasn't using gender improperly to excuse jurors. The one other thing I wanted to touch on, and this Court didn't bring it up in Petitioner's argument, so I don't know how important it sees that, and, frankly, I think the points just made are just positive, but as the District Court noted, this whole sort of comparative juror analysis, this far-ranging comparative juror analysis that Petitioner now seeks on appeal, which he did not seek in the trial court, really goes mostly toward the Step 2 and 3 findings of Batson, rather than the prima facie itself. And, in any event, if Petitioner wanted that to be considered, it should have been part of the circumstances he showed and was required to show under Batson in the trial court at the time he made the motion. This is no time for engaging for the first time on appeal. All right. Thank you, counsel. Your time has expired. Thank you. Counsel, you did exceed your time, but we will give you one minute for rebuttal. And very briefly, I'd just like to correct some inaccuracies. I never argued that the belief that women stick together or men stick together was correct, merely that it was pervasive. I said that at least twice. Okay. Now, as to the comparative analysis, the reason that the comparative analysis was not argued in the trial court was because the comparative analysis argument is directed at the reasonable basis found for the first time on appeal. Nobody suggested that no prior jury experience was a basis at all for these challenges until the court of appeal adopted Respondent's argument to that effect. I then, in my reply brief, asked for a comparative analysis because there were numerous jurors with no prior jury experience who were permitted to sit. It would have shown that this was not a valid reason. The court of appeal, the district court of appeal, then said that Vox forbade them to do a comparative analysis on appeal to show that their reasons that they generated for the first time on appeal were protectual. It's an unusual posture for it to arise in, but that's the basis for the comparative analysis. As to the wrong standard, I would simply refer this court to Justice Kennard's brilliant dissent in Johnson, which I would point out that Johnson purports to be an explanation of what the law has always been. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is Anderson v. Roe. Good morning, Your Honors. Gerald Brannan, on behalf of Petitioner William Anderson. I want to direct my comments this morning to the Batson issue. Since the California court of appeal used the wrong legal standard when it affirmed the trial court's prima facie case analysis, the state court findings are contrary to firmly established federal law. They're not entitled to deference, and this court may conduct a de novo review. This is a pre-box case, really, isn't it? This precedes, yeah, the California court of appeal opinion precedes the box case and therefore is governed by Wade. In any event, this court need not address the preliminary issue whether a prima facie case has been met, because within the meaning of Hernandez, since the trial court moved on and addressed stage two and stage three of the Batson analysis, this court can assume that it can move on to those issues without really going back and addressing the prima facie case analysis. Does the state court in the state trial issue agree with that?
judges: Canby, Hansen, Rawlinson